So our first case of the afternoon is 4-13-0901, The Diocese of Quincy et al. v. The Episcopal Church et al. Let's see, for the appellant, we have Mary Costell. And for the appellee, we have Mr. Brenner arguing today. You're doing the whole argument, correct? Right. All right. Great. All right. Ms. Costell, you may proceed. May it please the Court, Mary Costell for the Episcopal Church and the Diocese of Quincy of the Episcopal Church, I'd like to make three points today. The first is that the First Amendment requires courts to defer on ecclesiastical questions in order to not totally subvert religious institutions. And the ecclesiastical question before the court in this case is whether a diocese can unilaterally withdraw from a hierarchical denomination, in this case the Episcopal Church. The principle of deference was first articulated in the Watson case in the late 19th century. And Watson, Gordon Watson, said that the reason that we defer is because otherwise it would lead to, and this is a quote, the total subversion of religious bodies. The ecclesiastical question in this case is whether the Diocese of Quincy could withdraw from the Episcopal Church. Now… Counsel, let me ask you this. Do we have to resolve that question before we can resolve the issue of who is entitled to this property? Respectfully, Your Honor, no. What the court is required to do because it's an ecclesiastical question is to defer to the denomination's determination of that question. The court is prohibited by the First Amendment from resolving whether a unit of a larger organization, of a church organization, can withdraw. It's a polity type of question. And of course, in this instance, don't we have a situation where the higher body, the highest body of the church hasn't made a decision that we would have to defer to? No, that's not correct, Your Honor. There were a number of decisions. First, before the Diocese of Quincy voted to withdraw in November 2008, there were two decisions by the highest body in the Episcopal Church that had been assigned by the General Convention to make these decisions, which in this case is the House of Bishops. And when you say the highest body, that gets us to this issue of whether or not there is a hierarchical set up here. Exactly. So you're assuming and saying that the highest body has made a decision that there is. Yes, and I can turn right to that point if Your Honor would like. Okay. Yes, yes, it is our position, it is the view of every court in the country that has looked at this question, including a court in the Supreme Court of Texas, which does not take the same view about deference, but nevertheless has said that this church is a hierarchical church. Every court in the country that has looked at this church has called it a hierarchical church. So why is it a hierarchical church? It's a hierarchical church because the fundamental defining characteristics of this religious body are decided by the top, are decided at the General Convention level. So what are they? The General Convention is the only body that adopts and amends the fundamental faith document of this church, which is the Book of Common Prayer, so that every diocese, every parish that is part of this church uses that fundamental faith document. Second, who gets to ultimately pass on the selection of bishops, who are the leaders of the individual dioceses? The individual dioceses can elect their bishops, but they can't become bishops of their dioceses without the consent of a larger church. What body prescribes the standards of conduct for bishops and can decide to remove bishops, even against the will of the diocese? And that has happened, it's in the record. The General Convention. The General Convention either does it itself or it has assigned that task to the House of Bishops. The General Convention also has prescribed oaths that all of the clergy in the church have to take, and that includes an oath promising to abide by the doctrine, discipline, and worship of the Episcopal Church. That includes priests and bishops. When a diocese comes into the church, it must accede to the church's governance. And when the Diocese of Quincy came in, in 1877, it acceded to the church's governance as it was required to, and it also expressly stated in its original governing document that it recognized the authority of the General Convention. Dioceses can't change their borders, they can't divide without the consent of the General Convention. This is not a church where independently autonomous bodies come together once every three years and make some flimsy decisions. This is a body where the top legislative entity, the General Convention, sets the most important decisions for the church. That's a hierarchical church. Wouldn't you normally look to the Constitution and canons of a church to determine how it's to be governed? And I thought your expert was Mullen, wasn't it? Yes, Your Honor. And I thought Mullen testified that there's nothing in the Constitution or canons of the sets out the authority of the church with respect to property owned by the diocese. Respectfully, Your Honor, Professor Mullen testified that there's nothing in the Constitution or canon that designates the General Convention as the supreme authority, unlike our federal constitution. But he does say that the church is hierarchical because there's so much authority that is exercised by the General Convention. Understand that the history of this church was evolving at the same time as this country was coming together because this church was being formed at the point of the Revolution. It was the successor to the Church of England in this country. And so the Church of England, in order to be part of the Church of England, you had to take an oath of conformity to the crown. That couldn't no longer happen, obviously, because these were Americans. And so this church was forming at a time when the nation was being formed. But it did not need to put a supremacy clause in its documents because it was understood the Church of England. In the Church of England, the top tier was supreme. It was an understood concept. We wouldn't be here today, though, if they had a supremacy clause in their canons and constitutions, would we? Well, we might, but it would be in a much better position. And you probably would have been in a better position in front of Judge Archibald, wouldn't you? Your Honor, let's talk about what's happened in the parish cases, which is that the Diocese of Quincy in 1994 took the position that a parish could not leave the church and was subordinate. It is clear. By the way, they also said that the church is hierarchical up to the General Convention. But let's just stop for a moment and look at the diocese to the parish relationship. That relationship, everyone concedes it's hierarchical. Everyone in this room. Is there something in a written document that says that? No. Nothing in the Diocesan Constitution says that a parish can't leave. Nothing in the Diocesan Constitution says that the diocese is supreme over the parish. Everyone concedes that's a hierarchical relationship. It's the same situation. The kind of accession that a parish makes to a diocese is the same accession that the diocese makes to the General Convention when it comes into the church. It's the same relationship. Now that question as to whether or not it is a hierarchical situation was one made by the trial court after hearing testimony and thus that is subject to the manifest weight standard. Is that correct? Let's talk about the testimony. There was a lot of testimony. You're right. Okay. Before you get to talking about the testimony, in terms of the standard of review as to that determination, is that a manifest weight standard that we're to apply? Well we don't believe that the court made a credibility decision about any of the witnesses' testimony. We don't see that on the face of his... He talks about what some of them said, I think Professor Nolan especially, but when you look at the findings of fact, they're findings that he drew from the documents. Well you had an expert, but the other side had an expert. We had actually... There were three weeks of trial. We did. So I think in your brief you said there's no disputed issues of fact and I was wondering why was there a three-week trial then? Well there was a three-week trial, Your Honor, because we moved for summary judgment and we moved on the basis, we moved on the ground that the documents were clear and the court should decide the case on the documents. And the court issued a decision saying he could draw inferences from these documents, it would be reasonable to infer that the church is hierarchical from these documents, but he had further questions and it was clear that he wanted to hear testimony. Now it was our view that the only truly relevant testimony that you could have in this kind of case where we're trying to discern what's the deal when in 1877 when Quincy became a It's not clear from the documents, you look at other evidence to discern the intent of the parties. The most probative witness testimony would be from someone alive in 1877. There wasn't anybody. So we had testimony from witnesses who were drawing inferences from historical documents because that's the best we could do. We put on two witnesses. We put on Professor Mullen who is a historian, has been studying the Episcopal Church for Bishop Buchanan, the Bishop of the Diocese. The other side put on nine witnesses, largely purported experts on a variety of topics. And so I would posit that it's not surprising given that amount of testimony that the court found that there was some confusion on the issue. Our view has always been that there wasn't, he didn't need to go there because there wasn't confusion in the first place. This is a very different case from the Grace case. In Grace the governing documents of the church said this, in relation to its members the Synod is not an ecclesiastical government exercising legislative or coercive powers and with respect to the individual congregation's right of self-government it is but an advisory body. Now it also had provisions that said that the Synod could expel people. So the court in Grace understandably brought in experts or invited experts to testify about whether, what was the deal? Was it hierarchical or not? This was not our situation. Grace does not apply in this case. The documents in our view are clear. The governing documents are clear, they're as clear for dioceses as they are for parishes. But these documents are subject to interpretation. Similar to a patent case where you have patent documents and then you have engineers, engineering experts testifying for the parties. And then the trier of fact has to make a determination, a factual determination as to which interpretation is correct. Here, getting back to Justice Pope's question, with a three-week trial with lots of witnesses talking about the interpretation of these documents, wasn't it within the province of a factual determination as to whether or not it was hierarchical? And then given that, aren't we left with a manifest way standard to apply? We think that if this court believes that neither the governing documents nor all of the documents, historical documents, were put into evidence from which all of these witnesses testified and drew their conclusions, if none of those documents this court finds to be dispositive, and we would posit that the first tier is absolutely dispositive and if they're not, the second tier is too, then yes. But we think it was a mistake to get to that level. And by the way, we think the testimony under the manifest weight, because you don't take So the documents themselves, the governing documents themselves, plus the historical documents, by the way, including commentators from the 19th century, this was uncontradicted and there were no contrary evidence. Every commentator that was writing at the time that the Diocese of Quincy became a diocese of the Episcopal Church, when asked the question, could a diocese withdraw, once it acceded, did it retain the power to withdraw, the answer was no. Based on what though? Based on what? Based on their study of what was happening at the church at the time. But there's nothing in the canons or constitution of the church that prohibits a diocese from withdrawing. Isn't that correct? There is no clause that says a diocese may not withdraw. Now there's a canon that provides for the withdrawal of missionary dioceses. And a missionary diocese is a diocese that exists outside of the geographic territory of the United States. And that can only be accomplished under this canon by the consent of the general convention. And so it's our view that that's further evidence that the general convention, that the idea of a geographic territory seceding from the church, it is not even, it's not even fathomable. It's not the way the church works. The church is a geographic, it's a national church, it has geographic subdivisions, geographic subdivision does not secede. The idea, the Anglican idea is that you get along with the people in your geographic subdivision no matter how hard it is. You don't secede because you begin to disagree on issues. That's the way this church works. Now, a couple of points. The trial court did not make a determination, it left open the question of whether there was an ecclesiastical question here. Because this court, correctly, in the Clay case, had before it a provision in a governing document that said if the local church ceases to function, that's a quote, as an Assemblies of God church, the property would revert to the Assemblies of God denomination. And the court said correctly, we can't decide if a church ceases to function as an Assemblies of God church. That's an ecclesiastical question. And in our case, there is not a particular provision that embeds a religious concept in the same way. In our case, it's more like the St. Mark Coptic Orthodox Church, or the Serbian Eastern Orthodox Church, where in the St. Mark Church, the question was which of two sets of bylaws govern. There was a set of bylaws that had been promulgated by the Pope of that church that were purportedly supposed to govern all of the parishes in that church. There was another set of bylaws that this particular parish, the St. Mark Coptic Parish, purported to have adopted, which gave the parish a lot more autonomy. And there were a lot of facts in the record about the adoption of either of these. And the court, in that case, refused to decide the question. It said the question of which bylaws governs this local church that is part of this hierarchical denomination, and who is the correct faction, those are ecclesiastical questions we can't entertain. So we look to the hierarchical church. That church was admittedly hierarchical in that case to resolve that question. So here, the same kind of ecclesiastical question needs to be answered. It needs to be answered by the church, and it has been. One question that Your Honor asked was whether the church had made a decision. And several times the church has decided that a diocese can't leave, and this diocese couldn't leave and didn't leave. So this diocese had a vote in November 2008 to purportedly withdraw itself from the church. But earlier that year, in March and again in September 2008, the Episcopal Church's House of Bishops, which is the body that the General Convention has assigned, has delegated its authority for this task, it decided that two bishops in two other dioceses had wrongly taught that their diocese could leave the church, because that was against the polity of the church. So the church had made the decision before this diocese took its vote, and it had decided that a diocese cannot leave this church. That's against this church's polity. Then after the diocese, this diocese took its vote, the church had its triennial meeting and the church decided to organize, to recognize the people, the loyal Episcopalians who had reorganized the diocese, as the continuing diocese of the church. By that action, it blessed, it essentially, it gave its authority to those people. In other words, and by using the word continuing, it recognized that the other diocese, that the diocese had not left, but it was the reorganized Episcopalians who were continuing that effort that had been there since 1877. Quickly, if this were a dispute between secular organizations, voluntary association law does apply. That body of law governs a relationship between entities, and here we have a question about a relationship between a diocese, which incorporated, by the way, only in 2005, and an Episcopal church, a larger Episcopal church. And imagine a secular entity where you have a national organization, its regional body decides to divide into two, but it doesn't until it gets the consent of the national body. It gives half of its local units over to this new organization, which promises to obey the national body's rules, and it operates for over a hundred years as holding itself out as part of this national body, and using all of its materials, and trading on that name. Voluntary association law is not going to let the current membership of that organization withdraw it from the national. It will let the people leave, just like in this case, locals can opt to leave and worship anywhere. This is a free country, and we have freedom of religion, but you can't dismantle the organization, the national organization that was clearly hierarchical when you came in. And in closing, I'd like to say that if the trial court is affirmed in this case, essentially what will be happening is it will allow disgruntled Episcopalians to use the courts to dismantle a hierarchical church that has existed since the birth of this nation. Thank you. I'll ask you on rebuttal. I'm going to write my question down and give you a chance on rebuttal. Mr. Brenner? Yes. Thank you, Justice. Please. The court, Ms. Gospel, Mr. Beers, I'd like to make three essential points. Number one, Illinois is a neutral principles of law state. It has been adopted uniformly throughout our court system in the state of Illinois. My second point is that the deference suggested by Ms. Gospel, number one, cannot be demonstrated by the facts in this case, and number two, it's not even constitutionally available. My third point is that the trial judge made a number of findings of fact, and because of the number of findings of fact and the nature of those findings, this case needs to be reviewed on a manifest weight standard. First with regard to neutral principles of law, U.S. Supreme Court decided the case of Jones versus Wolf in 1979, and what the U.S. Supreme Court did was it said, we can look at church cases very similarly to any other association case. We're going to look at the deeds. We're going to look at local church charters. We're going to look at state statutes, and we're going to look at the constitution of the general church, and in doing so, we're going to look at all of these documents in purely secular terms, and we're going to employ concepts that are familiar to judges and lawyers throughout the country. Now there's a lot of beauty to the neutral principles approach. First, it works for every type of church structure imaginable. Doesn't matter if a church is hierarchical or congregational or a mixed polity of the two. It's simple. It favors no particular structure of church organization, and what Jones versus Wolf pointed out very, very clearly. It lets the parties fashion and structure their relationship in advance of any dispute. That is precisely what did not happen here. Counsel? Yes. In terms of the hierarchical nature of the church, your opponent says that every other court that's made the determination has found that it is hierarchical. First, is that accurate? And second, if so, why is this trial court's decision an outlier? Why is it what? Why is it an outlier? Why is it the one decision that has gone against that finding? Well, number one, Justice Harris, if we look at those cases, in most of them, counsel simply conceded that the church was hierarchical. It was never a litigated issue. Also they're mistaken. In South Carolina, it was specifically determined that the Episcopal Church is not hierarchical. That went all the way up to the Supreme Court. And so, in terms of the other cases, yes, they have a stack of cases which in dicta say the Episcopal Church is hierarchical. But what is also noteworthy about that stack of cases is those cases are examining the This case is fundamentally different. It is looking at the relationship between a diocese and the general convention of the Episcopal Church. Ms. Kostel in her argument said, well, members are free to leave the church. What she failed to point out was that the members of the Episcopal Church are not individuals. It's not churches. It is diocese that are the members. Diocese are what compose the Episcopal Church. So accordingly, even though there are those cases out there and in dicta they say that, whether the issue has been litigated, this specific issue, it has not. And this makes this case very, very unique. In most cases, there probably is a hierarchical relationship between a parish and a diocese. But what we also have to understand is there are 103 different dioceses of the Episcopal Church. Each one has its own constitution. None of those constitutions, to my knowledge, are the same. Each one of those constitutions is written locally and adopted locally. Now with regard to neutral principles, the trial court made a number of findings regarding the Diocese of Quincy. Number one, the Constitution of the Diocese of Quincy specifically states that its accession is contingent upon the continuing will of the local folks. The trial court also found there was nothing in the Constitution of the Episcopal Church to prevent the Diocese of Quincy from having that provision in its constitution. It found that there was nothing in the Constitution or canons of the Episcopal Church regarding property rights that embodied any religious concepts. It found that there was no prohibition on withdrawal. It found that there was nothing in the banking or agency agreement which mentioned the Episcopal Church, which gave the Episcopal Church any rights, or which created a trust in favor of the Episcopal Church. I think what we really have to remember is what we are talking about in this case is two pieces of property, a house that has been converted to an office, and a banking agreement. The banking agreement does not reference the Episcopal Church, and the Episcopal Church has never had anything to do with that agreement. Similarly with the deed to the diocesan house, it is a straight warranty deed that does not mention the Episcopal Church. It contains no religious concepts whatsoever. Using a neutral principles analysis, this case is very, very straightforward. The Episcopal Church essentially has nothing in writing that it can point to which would give it any entitlement or right to the property of the diocese of Quincy. And ironically, in their briefs the Episcopal Church even admits that nothing in the Constitution contains religious doctrine or concepts as it relates to the issues before the court. So as a result, we don't even have an ecclesiastical question. So I believe that Judge Ortval correctly found that the diocese of Quincy had prevailed on its complaint for declaratory judgment. Now Ms. Kostel strongly urges this court to follow a deference approach. What we have to realize with deference is in order for any court to consider deference, there has to be factual inquiries. There's no way to get around it. Number one, we have to identify the entities we're talking about. We have to establish that one is clearly dominant and one is clearly subordinate. And if we go back 150 years and look at the language in Watson, it defines this relationship as one where there are superior ecclesiastical tribunals with, quote, general and ultimate power of control more or less complete over the whole membership. And again, I'm stressing the members of the Episcopal Church are the diocese. Now if we look at the evidence that came out, why is the Episcopal Church not hierarchical? Well, diocese aren't defined, general convention isn't defined, the Constitution simply says there shall be a general convention. That's not much. General convention can pass canons, but it has no means of enforcing those canons. The canons, if they are enforced, are enforced by the diocese at the diocese's discretion. General convention cannot discipline a priest, it cannot discipline a layperson. And I think that is something very key because Judge Ortval found that the ecclesiastical authority of the Diocese of Quincy at the time it withdrew was the standing committee. The standing committee was comprised of the laypeople and priests, neither of whom general convention could do a darn thing about. The Diocese of Quincy was functioning without a bishop. Also, the Episcopal Church cannot review amendments to a diocesan constitution. A diocese is free to amend its constitution any time it so chooses. General convention can't send priests or deacons or another bishop into a diocese unless that diocese agrees. General convention cannot appoint a bishop for a diocese. General convention has no tribunal for dioceses. It has no way of disciplining a diocese. And most of this was even admitted by the Episcopal Church's own witness, Dr. Malvin. It can't force a diocese to disclose information. And general convention itself cannot discipline a bishop. A bishop is only subject to discipline by other bishops as opposed to general convention itself. And what if those bishops discipline one of their colleagues? The diocese doesn't even have to accept that. That bishop can be kicked out of the House of Bishops, but the diocese is a separate entity. These dioceses exist before they become part of the Episcopal Church. That is clearly the case here. And as a practical matter, in spite of what the Episcopal Church says, dioceses form themselves and after they are formed, they ask to join the Episcopal Church. These facts indicate that there is not anything that falls under the definition of Watson. Again, general and ultimate power of control, more or less complete. What we have is an association. What we have is a set of rules. And as we pointed out in our briefs, most times folks join an association or club.  But if a member chooses, for whatever reason, to leave that association, it does not mean that they are permanently linked to that association. Absent some sort of concrete language to the contrary, a member is free to disassociate. I think that's fundamental law of association. Does a parish or congregation have their own accounts or are all of the bank accounts owned by the diocese? Yes. Every individual church has its own account. The diocese has its own account for purposes of managing the diocese. But the churches are functioning, even though part of the diocese independently. Parishes own their own real estate. They definitely have their own financial accounts. Missions sometimes have deeds in the name of the diocese. Sometimes they don't, and we have a hodgepodge of deeds in this particular situation. But the only two pieces of property at issue in this case are the financial account under the agency agreement and the deed to the diocese accounts. Now, what deference, if it is to be used, requires is that we make a finding of this dominant subordinate relationship and a finding that the higher body has a right to control the subordinate body. The court also has to find that the finding or ruling of the general church was ecclesiastical in nature, and what we are dealing with are rights to property, no more, no less. Now, the necessity of a finding of facts was stressed by the U.S. Supreme Court in the Serbian case. There, both sides agreed that it was a hierarchical church, but the Supreme Court went on to look at the relationship, looked at the fact that the general church could review and reject any proposed changes of the local church's constitution or candidates. The general church there exercised a good deal of control over the local church. Now, the findings of fact were quite prolific in Judge Ortval's decision, and what we always have to be careful about when even considering use of deference is further instructions from the U.S. Supreme Court. They first began to come out in Maryland and Virginia churches versus Sharpsburg. They were solidified even more in Jones versus Wolfe. And what the Supreme Court has cautioned is civil courts cannot make a searching inquiry to determine the polity of a church. To do so would require civil courts to become immersed in religious doctrine. That's not the purpose of civil courts. And that's why the instruction of Jones versus Wolfe is so important. It says, clean up your documents and solidify your relationships before any type of dispute arises. You know, Mr. Brenner, it seemed to me like a lot of the testimony at the trial was related to ecclesiastical, thank you, precepts of the church and the history and the ecclesiastical history of the church and to matters of comedy, wasn't it? That's absolutely true. But what all of the testimony boiled down to is what is said, or more importantly, what is not said in the Constitution of the Episcopal Church. The Constitution of the Episcopal Church does not define the relationship of the parties. It does not create a dominant-subordinate relationship. Now, folks may, in consideration of general convention, go along with determinations of general convention. But going along with is far, far different from being mandated to follow. We have an organism, the general convention, which can speak. But that doesn't mean that it has any power to enforce. It has no power to discipline. And without those powers, it cannot fall within the definition of the Watson case. Now, Illinois has recognized the fact that we have to go into a fact-finding inquiry in order to determine relationships. This has existed long before Jones v. Bull. The state Supreme Court in Lowe stressed that we have to find the relationship of the parties before we can proceed. Shortly after Lowe, we have an appellate decision, Kelly v. Riverside. There we were dealing with a hierarchical church, but the court said that property ownership issues were unrelated to doctrine, and therefore, deference did not need to be applied. In short, Kelly v. Riverside was applying neutral principles of law before we even had that phrase. After Jones v. Bull, we've had a number of cases. The Grayson-Whirling decisions, those two are companion cases. There, a church decided to leave a general church, but there was an option agreement. So accordingly, the court had to look to determine if there was that dominant-subordinate relationship. Both sides had their own expert witnesses with their own opinions. Both sides had a big crate full of documents. And what the court determined was that the polity could not clearly be determined. And if polity cannot clearly be determined, then the civil court cannot go there. Because if the civil court is determining polity, the civil court has, in essence, violated the First Amendment. It is creating polity by deciding what is not clear. Again, our courts have heard the case in York. And in that case, which appears to be a hierarchical church, the court stated, quote, there must be an explicit mutual understanding of property right before deference. We don't have that mutual understanding. It cannot be pointed to in any of the documents from the Episcopal Church. Next, we have the Aglican decision. Again, what appears to be a hierarchical church. But the court ruled that the church had, the general church, had no authority to dismiss the board members of the local church. That court went so far as to say that if that were permitted, the court would be creating a polity for the church, which could not easily be seen from the church's own documents. We have such a situation here. We had the directors of the two diocesan corporations. They acted. They continued to act. They functioned under the not-for-profit corporation law of the state of Illinois. And several months later, they received a letter from the presiding bishop of the Episcopal Church stating she did not recognize them, whatever that means. But if we look at the Mohammed decision, again, whether someone, in that case, was a good Muslim was not the issue. The issue was should and must the court follow the state statute. And it looks like I'm out of time. So thank you very much. Thank you, Mr. Bryan. Ms. Kostel, rebuttal? And I have two questions I'm going to ask you, and then I won't take much of your time. Thank you. Isn't it true that there's, let me ask it this way. Can the church, the Episcopal Church, compel a diocese to tithe to the church? It could. It has not. It could. It has not. Okay. So there's nothing in their documents that make any diocese contribute back to them. It does not force it. But what it does do is it requires that all dioceses and parishes pay into a clergy pension fund for the benefit of that clergy, for their clergy. And everybody obeys that, and that's in the record. Okay. And then that kind of leads, you said they could, and that leads me to my next point. Couldn't the church, the Episcopal Church, amend its constitution and canons to provide that they're the dominant structure, and these are the rules, and you must tithe to us, and we discipline dioceses? It's our view that the general convention, because of the kind of body it is, could adopt any kind of provision like that. Yes, yes. And it's, you know, in 19, I think, 64 or 74, I don't remember, the church adopted a canon describing itself as a hierarchical church well before this dispute erupted. So that is in the, and that's in the record as well. So how does it describe itself as a hierarchical church? It uses the word hierarchical, saying this hierarchical church. Which means what? There may be parishes and dioceses and then the church. Correct. But as far as what we think of as hierarchical with a judicatory system and a disciplinary system and a tithing system back to the church, that does not exist in the framework. Well, you know, the tithing, first of all, there are judicatories, there are disciplinary judicatories, all defined by the general convention. And yes, the general convention leads to dioceses, the discipline of its clergy, but it sets up the standards, it requires how the courts are set up, it lays it all out. And that can be appealed to larger regional bodies. And the general convention also prescribes the standards of conduct for all bishops and sets up the tribunals. And contrary to what Mr. Brenner said, when bishops are disciplined by the church, if they are removed as a result of that discipline, they can no longer function in their dioceses. And that's, and there are examples of that in the record. So that's, yes. Now, a couple of things I'd like to raise. One, Mr. Brenner said it, he said what all the testimony boiled down to is what the governing documents said or didn't say. Well, that's our point. And that's why we think that the case should be decided on the documents. Another point. So why was hierarchy conceded in all those other cases? Because it's obvious. Watson, in 1871, when it was talking about hierarchical churches, just trots out a couple of examples, one of which is the Protestant Episcopal Church. And it wasn't just, it wasn't the name of the church, Protestant Episcopal, means the whole church. It's not a diocese. The Watson court understood the Episcopal Church to be a hierarchical church, a national hierarchical church, when it defined what it meant to be hierarchical. It's right in the opinion. Finally, Illinois courts understand that adoption of neutral principles does not mean, well, we're going to blind our eyes to the fact that this is a church. If there's an ecclesiastical question here, we cannot go there. The appellees would hope that the court would forget that this is a church case and look at the documents as though this were a secular deal between two arm's length entities. A number of courts have rejected that view. Jones says that you only apply neutral principles if these other issues don't apply. The Supreme Court of Virginia recently said we don't apply the law that way. We don't look at churches as though they're dealing with each other as though they're third parties operating at arm's length. These local entities take their identity from the larger church, and we have to take that into account even when we're applying neutral principles. I have nothing further. Thank you. Thank you, Ms. Kessler. All right, counsel, I think both of you did a very good job arguing this case. It gives us a lot of paper time, and so we're going to be in recess until the next case and take your matter under advisement.